## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No.:   5:20-cv-885 |
| : | |
| **VICTOR LEE FARIAS and** : | |
| **INTEGRITY AVIATION & LEASING, LLC,** : | |
| : | |
| Defendants. : | |
| : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") files this Complaint against

Defendants Victor Lee Farias ("Farias") and Integrity Aviation & Leasing, LLC ("IAL")

(collectively "Defendants"), and alleges as follows:

## I.
## SUMMARY

1.      From 2013 through January 2019, Farias and his company, IAL, defrauded

investors—many of whom were retired San Antonio Police Department officers or first

responders—out of more than $14 million through a fraudulent investment scheme involving the

offer and sale of purportedly secured promissory notes.  Defendants represented to investors that

their money would be used by IAL to purchase aircraft engines and other aviation assets that

would be leased or sold to major airlines and that revenues derived from this business would be

used to pay investors interest on their investments at the rate of 10-12% per year.  Farias and IAL

also represented that the promissory notes, which were issued by IAL, were secured by IAL's

assets.

2.      In fact, Farias and IAL misrepresented many facets of the offering, misspent a significant portion of the investors' funds, and used only a small portion of the investor funds for their intended purpose.  Specifically, Farias and IAL used approximately $6.5 million of the $14 million raised to pay investors Ponzi-like returns, invested approximately $2.7 million in a friend's gas station and convenience store project, and paid nearly $1 million in undisclosed and impermissible sales commissions to IAL's sales staff for their successful efforts in recruiting investors to purchase IAL's promissory notes.  Furthermore, Farias misappropriated $2.4 million of investor funds for his own personal use, including disbursements for meals, entertainment, auto expenses, retail purchases, travel, apartment rent, jewelry and other luxury retail purchase, and golf and country club expenses.

3.      Additionally, despite representing that the promissory notes would be secured by IAL's assets, neither Farias nor IAL took any steps to file the necessary documents to secure the investors' interests.  Even worse, they omitted to inform investors that Farias had already pledged IAL's assets as collateral in a separate deal to benefit a separate company that Farias owned.

4.      As new investor funds dried up, Farias deceived at least one investor with the lie that he was taking IAL public in an initial public offering, so he could repay all investors, and that he was working with the SEC on the offering.  To support that lie, he sent a carefully cropped photo of the SEC's investigative subpoena to that investor, as proof of his communications with the SEC, and blamed the SEC for the alleged delays in the IPO process.

5.      Through their actions, Defendants have violated and, unless enjoined, will continue to violate the antifraud and securities-registration provisions of the federal securities laws, specifically Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

6.      To protect the public from further fraudulent activity, the SEC brings this action against the Defendants and seeks (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains, plus prejudgment interest; (iii) civil penalties; and (iv) an order barring Farias from serving as an officer or director of a public company.

## II.
## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78(aa)].

8.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §§ 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business described herein occurred within the Western District of Texas.  Farias and IAL sold promissory notes to investors across multiple states, but focused significant sales efforts on retired San Antonio police officers and other first responders.  Further, Farias resides in Fair Oaks, Texas, and IAL maintains its principal place of business in Boerne, Texas—both locations within the San Antonio Division of the Western District of Texas.

9.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

### III.
### PARTIES

10.      **Victor Lee Farias**, age 46, resides in Fair Oaks, Texas.  Farias is the founder,

CEO, and sole managing member of IAL.  He is also the founder, president, and sole managing

member of Integrity Aviation Finance, LLC ("IA Finance"), a Nevada company headquartered in

Boerne, Texas.  Farias was formerly associated with a registered broker-dealer and investment

adviser and held several securities licenses, all of which have expired.

11.      **Integrity Aviation & Leasing, LLC** is a Texas limited liability company

founded by Farias in August 2013, with its principal place of business in Boerne, Texas.  It is

wholly owned and controlled by Farias.

### IV.
### STATEMENT OF FACTS

**A.      Origins of IAL**

12.      In August 2013, Farias started IAL to participate in the aircraft engine leasing

market.  Farias's plan was for IAL to buy, refurbish, repair, and lease aircraft engines and other

aviation assets to major airlines.  To fund this business, Farias and IAL offered and sold to

investors IAL securities in the form of secured promissory notes (the "Promissory Note

Offering").

13.      The Promissory Note Offering, which continued through January 2019, was not

registered with the SEC.

**B.      IAL's offering documents**

*Private Placement Memorandum*

14.      In March 2015, approximately a year and a half into the Promissory Note

Offering, Farias and IAL began providing investors and prospective investors with a Private

Placement Memorandum ("PPM") that explicitly described the ongoing Promissory Note

Offering, which sought to raise $50 million.  While Farias and IAL retained an attorney to draft

the PPM, Farias was responsible, as the sole managing member of IAL, for the substance and

accuracy of the information set out in the PPM and had ultimate authority over the PPM's

contents.

15.     The PPM provided that the promissory notes would: (a) have a 30-month term,

(b) be secured by IAL's assets, as reflected in a security agreement, and (c) pay interest on a

quarterly basis at a 12% annual rate of return.  Farias signed the promissory notes and security

agreements on behalf of IAL.

16.     The PPM described IAL's purposes and objectives, all of which related to

acquiring, selling, and leasing airplane engines and aviation assets.  The PPM stated that IAL's

primary purpose was "acquiring and selling, opportunistically, aircraft engines, airframes, and

related parts of assets ('Aviation Assets')."  Its other purposes were "to buy, rebuild, and lease

used aircraft engines to commercial aircraft carriers" and "to purchase equity and/or debt

instruments of entities that will provide the company with a strategic or market advantage

enhancing its ability to attract capital or acquire Aviation Assets."

17.     The PPM also detailed IAL's authorized uses of investor funds.  Some of these

expenses included, but were not limited to: expenses associated with acquiring, managing,

selling, encumbering, or otherwise disposing of assets; due diligence expenses related to leases,

assets, and investments; normal operating expenses incidental to the provision of day-to-day

administrative services to the company; expenses related to legal, audit, accounting, and tax

preparation services; taxes and other governmental charges; organizational and offering

expenses; fees and reimbursable expenses of IAL's collateral agent; and salaries of officers and

directors.  The PPM explicitly provided that Farias would *not* receive compensation from the company for his services in managing IAL's business.

18.     In addition, the PPM authorized the payment of certain commissions, but only in connection with brokering the purchase or sale of Aviation Assets or in "sourcing deals on behalf of the company."  It did not provide that commissions would be paid to salespeople for recruiting investors.

### *Offering Brochure*

19.     In addition to the PPM, Farias and IAL's salespeople provided prospective investors with an offering brochure ("Brochure").  The Brochure described the $50 million offering and included glowing descriptions of the aviation asset leasing industry.  It also incorporated photos of airplane engines lined up in a warehouse, with charts showing the percentage of industry use for each engine.

20.     The Brochure represented to investors that IAL was "uniquely positioned to take advantage of this growing market, acquiring and deploying aviation assets at attractive terms."  It stated that, upon completion of the offering, IAL "expected to generate gross revenue in excess of $15 million per year with asset value in excess of $35 million."

21.     As IAL's sole managing member, Farias had ultimate authority over the contents of the Brochure.

### *IAL's Website*

22.     Similarly, Farias and his salespeople directed prospective investors to IAL's website for more information on the company and the investment opportunity.  IAL's website gave false impressions of IAL's size, success, sophistication, and experience.

23.     For example, the website included a "Products" page with detailed descriptions of

three aircraft engines, leading investors to infer that IAL owned those engines, or at least those

types of engines.  The website also claimed that its "current lease portfolio included domestic

and international carriers," which gave the impression that IAL had an existing inventory of

engines it was actively leasing out to airlines.

24.     IAL's website stated that the company had "over 50 years of collective experience

in the investment industry."  It also stated that, prior to forming IAL, Farias was "Managing

Director" a FINRA-registered broker dealer, in charge of developing fixed income sales and

trading for [the FINRA-registered broker dealer] network of Advisers, from 2011-2013."

25.     The website claimed that IAL used a "proprietary algorithm" to determine if a

specific aircraft engine was suitable for purchase.

26.     As IAL's sole managing member, Farias reviewed and approved the website's

content.

## C.     Farias and IAL defrauded investors

27.     Many of the representations Defendants made to investors were false.  Since at

least 2015, when IAL issued the PPM, it appears that IAL has not purchased a single airplane

engine.  Further, Defendants used only a fraction of IAL's funds to purchase airplane *parts*, and

IAL has generated negligible net revenues from sources that do not appear to be from the leases

of aircraft engines.

28.     Instead of using investor funds to purchase airplane engines for lease, as

promised, Defendants used investor funds predominantly for unauthorized purposes.  For

example, between 2013 and 2019, Farias and IAL used approximately $6.5 million of the $14

million raised from investors to make bogus, interest payments back to investors.  Encouraged by

these regular payments, which made it seem like IAL's business operations were generating

revenue, many investors reinvested their principal back into IAL when the terms of their notes expired. In fact, these regular quarterly interest payments were sourced almost exclusively from funds invested by other investors because IAL earned, at most, minimal net revenues.

29.     Additionally, Farias and IAL used $2.7 million of investor funds to invest in a high school friend's gas station and convenience store. Farias used IAL investor funds to finance the construction of the store, even though the gas station/convenience store project was not an authorized use of investor funds.

30.     Farias also misappropriated at least $2.4 million of IAL investor funds for his own personal use. He made net transfers of $1.6 million out of IAL's bank account directly into his personal bank account (including $1.3 million that was transferred after August 1, 2015), and he misused an additional $800,000 to pay for meals, entertainment, auto expenses, retail purchases, travel, apartment rent, jewelry and other luxury retail purchases, medical and dental expenses, and golf and country club expenses. The PPM explicitly provided that Farias would not be compensated for his work as IAL's sole managing member.

31.     Defendants also paid nearly $1 million in undisclosed sales commissions to IAL's salespeople for successfully recruiting investors to purchase the IAL promissory notes. The PPM stated that commissions would be paid only "in connection with brokering the purchase or sale of Aviation Assets or sourcing deals on behalf of the company." None of the IAL salespeople, however, brokered the purchase or sale of Aviation Assets for IAL.

32.     Moreover, Defendants' representations that the promissory notes were secured with a security interest in IAL's assets was also false and/or misleading. The representations about the security interests implied that noteholders would have a first lien position on IAL's assets. In fact, neither Farias nor anyone else at IAL took any steps to file the necessary

paperwork with the Secretary of State to perfect the security interests.

33.    Even if Farias or IAL had undertaken such steps, investors would not have been protected.  In November 2015, and unbeknownst to investors, Farias, on behalf of IAL, conveyed a security interest in IAL's assets to IA Finance—a separate company owned, controlled, and managed by Farias—for the benefit of investors in IA Finance.  For all IAL promissory notes purchased after November 2015, investors would have been, at best, in a second lien position—had Defendants ever undertaken the steps to perfect their security interests.

34.    Farias and IAL further misrepresented their experience in the industry and background.  Farias had never been Managing Director of the FINRA-registered broker dealer, and had, in fact, been terminated by the company.  Nor did IAL possess a proprietary algorithm to determine whether an airplane engine was suitable for purchase.

**D.    The Promissory Note Offering raised in excess of $14 million**

35.    Defendants obtained millions of dollars from investors by virtue of the fraudulent acts detailed above.  Between 2013 and 2019, Defendants obtained approximately $14.05 million in the Promissory Note Offering from approximately 88 investors in at least five states.  Of the $14.05 million, Defendants raised approximately $10.1 million since August 1, 2015.

36.    Defendants used salespeople to offer and sell the securities to investors, but Farias also directly sold to investors.  Typically, IAL salespeople met with potential investors at restaurants or in the investors' homes to discuss the terms and benefits of the IAL promissory-note investment, using talking points provided by Farias.  The undisclosed sales commissions incentivized the salespeople to recruit investors.

37.    Most of the investors had no prior relationship to Farias or IAL.  While the Defendants targeted investors in multiple states, many of the investors were retired San Antonio

police officers and other first responders.

38.     Investors received a document styled, "Secured Promissory Note," which included the terms, investment amount, maturity date, and interest rate, and a "Security Agreement," which purportedly secured the promissory note with a security interest in all of IAL's assets. Farias signed these documents, usually as IAL's "Managing Member," but sometimes he signed as IAL's "CEO."

39.     The amounts invested in the promissory notes by investors varied widely, from as low as $1,000 to as much as $600,000. One retired San Antonio police officer invested $531,000 by pooling the money from his and his wife's IRAs and sending it to Defendants.

40.     Because investors were frequently retirees, many had their savings in retirement accounts. In order to purchase the promissory notes from Defendants, they had to withdraw retirement funds from established retirement accounts and deposit them in newly created, self-directed IRA accounts in order to tap into those retirement savings for investments in IAL.

41.     Once their retirement funds were in self-directed IRA accounts, the investors transferred the funds directly into IAL's bank account, where their money was commingled with other investors' money.

42.     Farias and IAL did not make any efforts to determine whether the investors satisfied the statutory definitions of "accredited" or "sophisticated" under the Securities Act, steps required for a securities offering to be exempt from SEC registration. If the investors were not accredited, IAL was obligated to provide them with audited financial statements, from which they would have been able to more accurately evaluate IAL's financial condition and business prospects (or lack thereof). But IAL did not have audited financial statements to provide to investors. Nor did it provide investors with *un*audited financial statements.

**D.**     **As new investment funds dried up, Farias lulled investors with lies**

43.     By the spring of 2018, fewer investors were purchasing IAL notes.  Without new investors, Farias had little-to-no money to continue paying the sham quarterly interest payments—which were, essentially, Ponzi payments, since the vast majority of those payments were derived from other investors' funds.

44.     As questions from investors increased, Farias called an in-person meeting of IAL investors in June 2018 in San Antonio.  At the meeting, Farias lied to investors about a meritless lawsuit that he claimed had frozen IAL's accounts.  In fact, no such asset or account freeze had occurred.

45.     After that meeting, Farias continued to lie to investors.  He told at least one investor that he was taking IAL public for the benefits of IAL investors; that he was waiting on SEC approval for the initial public offering of IAL's stock; and that the SEC staff was delaying the IPO approval process.  All of these representations were false.  To try to add legitimacy to these baseless claims, Farias photocopied the SEC's letterhead from the investigative subpoena the SEC's staff had sent to him and used it to falsely claim that he was working with the SEC to take the company public for the benefit of the IAL investors.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM
### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

### (Against Both Defendants)

46.     Plaintiff repeats and incorporates by reference paragraphs 1 through 45 of this Complaint as if set forth *verbatim* herein.

47.     By engaging in the conduct described above, Defendants Farias and IAL, directly

or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange have: (a) employed a device, scheme or artifice to defraud; and/or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in an act, practice, or course of business that has operated or will operate as a fraud or deceit upon purchasers, prospective purchasers, or other persons.

48.     Defendants Farias and IAL engaged in the above-referenced conduct with *scienter*.

49.     By engaging in the conduct described above, Defendants Farias and IAL violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>**SECOND CLAIM**</u>
<u>**Fraud in the Offer or Sale of Securities**</u>
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

**(Against Both Defendants)**

50.     Plaintiff repeats and incorporates by reference paragraphs 1 through 45 of this Complaint as if set forth *verbatim* herein.

51.     By engaging in the conduct described above, Defendants Farias and IAL, directly or indirectly, singly or in concert with others, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, have: (a) employed a device, scheme, or artifice to defraud; and/or (b) obtained money or property by means of untrue statements of material fact or omitted to state a

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in a transaction, practice, or course of business which operates or would operate as a fraud and deceit upon the purchaser.

52.     With respect to violations of Section 17(a)(1) of the Securities Act, Defendants acted with *scienter*.  With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants were at least negligent in their actions.

53.     For these reasons, Defendants Farias and IAL violated and, unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Unregistered Offer and Sale of Securities**
**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against Both Defendants)**

54.     Plaintiff repeats and incorporates by reference paragraphs 1 through 45 of this Complaint as if set forth *verbatim* herein.

55.     By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert with others, (i) made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to sell securities, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and/or (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of written contracts, offering documents, prospectus, or otherwise, securities as to which no registration state had been filed.

56.     By engaging in the conduct described above, Defendants Farias and IAL violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

(1)     Make findings that Defendants committed the violations alleged in the Complaint;

(2)     Permanently enjoin Defendants from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(3)     Permanently enjoin Defendants from directly or indirectly, including but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Farias from purchasing or selling securities for his own personal account;

(4)     Order Defendants to disgorge, jointly and severally, all ill-gotten gains obtained as a result of Defendants' illegal conduct alleged herein, with prejudgment interest;

(5)     Order Defendants to each pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(6)     Order that Farias is barred, pursuant to Section 20(e) Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l[, or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(6)     Grant such other and further relief as the Court may deem just, equitable, and

proper.

Dated:   July 30, 2020.                    Respectfully submitted,

                                           */s/ Janie L. Frank*
                                           JANIE L. FRANK
                                           Texas Bar No. 07363050
                                           B. DAVID FRASER
                                           Texas Bar No. 24012654
                                           REBECCA FIKE
                                           Texas Bar No. 24065228

                                           SECURITIES AND EXCHANGE COMMISSION
                                           Fort Worth Regional Office
                                           Burnett Plaza, Suite 1900
                                           801 Cherry Street, Unit #18
                                           Fort Worth, TX 76102-6882
                                           (817) 978-6478 (jlf phone)
                                           (817) 978-4927 (facsimile)
                                           frankj@sec.gov
                                           fraserb@sec.gov